UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 19-CV-5506 (CBA) (RER)
_____

Hyundai Capital America,

Plaintiff,

versus

Nemet Motors, LLC, a New York limited liability company;
and Scott A. Perlstein, Sr.,

Defendants.

_____

REPORT & RECOMMENDATION
_____

October 29, 2019

To the Honorable Carol Bagley Amon
Senior United States District Judge

**RAMON E. REYES, JR., U.S.M.J.:**

Hyundai Capital America ("HCA" or "Plaintiff") initiated this action against Nemet Motors, LLC ("Nemet") and Scott Perlstein, Sr. ("Perlstein"; collectively, "Defendants") on October 10, 2019. (Dkt. No. 1 ("Compl.")). Plaintiff alleges that Nemet breached contractual obligations under two agreements and Pelstein, as guarantor of Nemet's obligations, is liable for the amount due and owing to HCA. (Compl. ¶¶ 42–74). Plaintiff seeks an Order of Seizure for certain inventory serving as collateral to the agreements between HCA and Defendants. (*Id*. ¶¶ 1–41; Dkt. No. 3 ("Pl. Mem.")). Your Honor has referred this motion to me for a report and recommendation. (Order dated 10/15/2019). For the reasons set forth herein, I respectfully recommend that Your Honor grant the motion and issue an Order of Seizure.

**I.  BACKGROUND**

   A.  Factual Background

Plaintiff HCA is a California corporation that provides financing to authorized Hyundai dealers to enable these dealers to purchase Kia and Hyundai brand motor vehicle inventory. (Pl. Mem. at 3). Defendant Nemet is a New York limited liability company authorized to sell and lease

1

Kia and Hyundai vehicles. (Dkt. No. 12-1 ("Perlstein Decl.") ¶ 3). Perlstein is the President of Nemet. (*Id.* ¶ 1).

In September 2014, HCA and Nemet entered into the Inventory Loan and Security Agreement (the "ILSA"). The ILSA, together with other interconnected agreements between the two companies,[1] established that HCA would provide a line of credit to Nemet for the purchase of vehicles for Nemet's dealerships' inventory. (Compl. ¶ 1; Dkt. No. 1 at 36–48 ("ILSA")). The terms of the ILSA state that if Nemet sells, leases, or trades[2] a vehicle that was purchased using HCA's funds, Nemet has an obligation to immediately repay HCA the amount outstanding on that vehicle. (*Id.*). Nemet granted HCA a security interest in all personal property and fixtures of Nemet, including motor vehicles, whether or not financed by HCA; all accounts and accounts receivables; and all parts, accessories, display and demonstration items, returns and repossession and other personal property held for sale or lease (the "Collateral"). (*Id.* § 8). The security interest was perfected by the filing of a UCC-1 Financing Statement on July 25, 2014. (Dkt. No. 1 at 50).

Sections 9(a)(i) of the ILSA includes a provision binding Nemet to maintain all franchises "necessary to carry on the business as presently or proposed to be conducted." At the time Nemet entered into the ILSA with HCA, Nemet had a Nissan Motors franchise, in addition to its Kia and Hyundai franchises. (Compl. ¶ 16). Nemet's voluntary or involuntary termination of *any* franchise that existed at the time the Parties entered into the ILSA constitutes a default pursuant to Section 10(d) of the Ageement.

To facilitate Nemet's acquisition of Nissan inventory, Nissan Motor Acceptance Corporation ("NMAC") entered into a financing agreement with Nemet as borrower. (Compl. ¶ 3). After learning of this relationship, HCA decided to enter into an intercreditor agreement with NMAC on September 5, 2014. (*Id.*). Section 10(g) of the ILSA provides that if Nemet breaches any obligation to any creditor with which HCA has an intercreditor agreement, the breach constitutes an event of default under the ILSA.

In addition to the ILSA, HCA and Nemet entered into a Business Loan Agreement ("BLA") in August 2016, by which HCA loaned Nemet $400,000 to be used as working capital. (Dkt. No. 1 at 52–64 ("BLA")). Pursuant to Section 4 of the BLA, Nemet was required to pay 60 monthly installments on the first day of each month, in addition to interest. Section 12 of the BLA granted HCA a lien on and security interest in all of Nemet's personal property and fixtures. If Nemet did not make timely payments, HCA could accelerate the unpaid principal and interest to be immediately due and payable. (BLA § 11).

Perlstein entered into a Continuing Guaranty and Subordination Agreement. (Dkt. No. at 148–56). This Agreement declared that Perlstein would be joint and severally liable for any breach by Nemet under the ILSA or BLA. (*Id.*).

On June 6, 2019, NMAC filed suit against Nemet in this Court alleging Nemet's failure to repay NMAC $2,702,631.94 for the sale of at least 192 vehicles financed by NMAC. *Nissan Motor*

---

[1] HCA's wholesale credit lines to Nemet were secured by the ILSA, a UCC-1 Financing Statement including all of the Collateral, a business loan agreement, a promissory note, an intercreditor agreement, and a guaranty and subordination agreement between HCA and Defendants. (*Id.* ¶ 4).

[2] The same terms apply if a vehicle is destroyed, stolen, lost, or confiscated. (ILSA § 4(a)).

*Acceptance Corp. v. Nemet Motors, LLC*, 19-CV-3284 (NGG) (CLP) (Dkt. No. 1 ¶ 1). When HCA learned of Nemet's alleged breach of the agreement with NMAC, HCA sent a letter to Nemet terminating the ILSA pursuant to Section 6(a)(ii) of the Agreement. (Dkt. No. 1 at 66). HCA took this action out of "substantial fear that Nemet Motors was undercapitalized, and that Hyundai Capital's Collateral was also at risk of being transferred without payment to Hyundai Capital." (Compl. ¶ 22). Shortly thereafter, Nemet sent a notice of voluntary termination of the Nissan franchise to Nissan North America, Inc. (*Id.* ¶ 16). HCA then sent a notice of default[3] to Nemet on July 23, 2019, requesting relief pursuant to the terms of the agreement. (Dkt. No. 1 at 68–69). Section 11 of the ILSA provides that upon a default HCA is entitled to, *inter alia*, immediate repayment of all outstanding advances and interest, the right to demand and take actual or constructive possession of the Collateral, appoint a "keeper" to serve as HCA's representative on Nemet's premises, take possession of the titles and keys of the vehicles serving as Collateral, as well as any other tangible or intangible property constituting Collateral. (ILSA § 11). Following the notice of default, Nemet consented to HCA placing a keeper on its premises and requested that HCA waive certain rights under the ILSA, to which HCA declined. (Compl. ¶ 25–29).

On September 10, 2019, Nemet failed to pay HCA interest due under the ILSA and BLA, which prompted HCA to send a second notice of default demanding immediate payment of the outstanding $5,125,997.44 due to HCA. (Dkt. No. 72–73). Nemet did not comply. (Compl. ¶ 32). Nemet also has failed to make the interest payment due on October 10, 2019. (Transcript of 10/23/2019 Hearing ("Tr.") at p. 8).

### B. Procedural Background

HCA filed suit against Nemet on October 10, 2019, requesting a writ of seizure and alleging Nemet's breach of the ILSA and BLA, and Perlstein's breach of the Guaranty Agreement. (*See generally* Compl.). HCA also applied for entry of an order compelling Defendants to show cause why the Court should not issue a writ of replevin for the vehicles, which is supported by a memorandum of law, a verified complaint, a list identifying the vehicles and the amount due on each vehicle, and copies of the Agreements. (*See* Pl. Mem.; Compl.).

Counsel for HCA appeared before Judge Matsumoto on the same day suit was filed to request a temporary restraining order ("TRO") ordering Defendants to: 1) continue to permit a keeper to remain on its premises; 2) to give the keeper possession of all titles and keys for the vehicles serving as Collateral; and 3) to refrain from selling, transferring, moving, hypothecating, or signing any interest in the vehicles. (Tr. of TRO Hearing at pp. 2–3). Judge Matsumoto, recognizing the possibility of irreparable harm absent the issuance of a TRO, granted Plaintiff's first and second requests but modified the third request to read: "Defendants shall not *other than in the ordinary course*, sell, transfer, move, hypothecate or assign any interest in the Collateral pending further Order of this Court." (Dkt. No. 9 at 2; Tr. of TRO Hearing at pp. 11–12). Judge Matsumoto also ordered that the Parties appear for a hearing on October 23, 2019, before Your Honor as to Plaintiff's requested order of seizure. (Dkt. No. 9 at 2). Your Honor referred the matter on October 15, 2019, and the undersigned held a hearing on October 23, 2019 (the "Hearing"). (Order dated 10/15/2019; Minute Entry dated 10/23/2019).

---

[3] The parties do not dispute that the aforementioned series of events constitute a default under the ILSA. (Tr. at p. 20).

The purpose of the hearing was for Defendants to show cause why Plaintiff is not entitled to the order of seizure. (Tr. at p. 1). I also addressed Plaintiff's request to continue the temporary restraints granted by Judge Matsumoto on October 10, 2019, and clarified that Plaintiff is not seeking a preliminary injunction at this time.[4] (Dkt. No. 13 ("Pl. Reply") at 3; Tr. at p. 3). The Parties consented, on the record, to extend the existing TRO by 45 days, (Tr. at p. 6). Accordingly, I ordered the TRO to expire on December 9, 2019. (Minute Entry dated 10/23/2019).

## II. DISCUSSION

### A. Legal Standard

Rule 64 of the Federal Rules of Civil Procedure provides that in a federal action "every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). Here, the New York Uniform Commercial Code provides that after a borrower defaults, a secured creditor "may take possession of the collateral" "through judicial process." N.Y. U.C.C. §§ 9-601, 9-609.

Section 7102 of the New York Civil Practice Law and Rules ("N.Y. C.P.L.R.") provides the procedure. To obtain an order of seizure plaintiff must submit an affidavit that "clearly identif[ies] the chattel to be seized" and includes the following declarations:

> 1. that the plaintiff is entitled to possession by virtue of facts set forth; 2. that the chattel is wrongfully held by the defendant named; 3. whether an action to recover the chattel has been commenced, the defendants served, whether they are in default, and, if they have appeared, where papers may be served on them; 4. the value of each chattel or class of chattels claimed, or the aggregate value of all chattels claims; 5. if the plaintiff seeks the inclusion in the order of seizure or a provision authorizing the sheriff to break open, enter and search for the chattel, the place where the chattel is located and facts sufficient to establish probable cause to believe that the chattel is located at that; [and] 6. that no defense to the claim is known to the plaintiff . . .

N.Y. C.P.L.R. § 7102(c)(1)–(6) (McKinney 2019).

Upon submission of an affidavit,[5] the court may grant an order of seizure if "it is probable the plaintiff will succeed on the merits and the facts are as stated in the affidavit . . ." *Id.* § 7102(d). Plaintiff bears the burden of establishing its right to the collateral. *Id.*

### B. Application

In support of its application, HCA submits a Verified Complaint, a copy of the UCC-1 Financing Statement listing the Collateral (Dkt. No. 1 at 50), and the declaration of Scott Smith, a Director-Commercial Credit with HCA (Dkt. No. 12-2 ("Smith Decl.")). These submissions

---

[4] Later in the hearing Plaintiff noted that it may seek a preliminary injunction in the future if a similar situation to that which gave rise to the TRO occurs. (Tr. at p. 15).

[5] The N.Y. C.P.L.R. also requires a plaintiff to present an undertaking to the court. § 7102(e). Section 19 of the ILSA, however, waives this condition: "In the event Lender seeks to take possession of any or all of the Collateral by judicial process, Dealer hereby irrevocably waives, to the fullest extent permitted by applicable law, any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession . . ."

establish the requirements under Section 7102(c)(1)–(6). Plaintiff additionally submits an Exhibit attached to the Complaint which clearly identifies the Hyundai and Kia vehicles that hold remaining principal balances.[6] (Dkt. No. 1 at 75–146).

Defendants admit they have defaulted on the Agreements, but request that the approximately one-hundred and thirty-eight (138) vehicles in question not be seized because: 1) all Parties will be better off without an order of seizure; 2) Plaintiff cannot seek the equitable remedy of replevin when it has unclean hands—Defendants claim HCA wrongfully told Hyundai Motors, the manufacturer, to withhold $400,000 due to Nemet for warranty claims, part orders, and manufacturer rebate money after Defendants' default; and 3) Plaintiff has not demonstrated that its lien is superior to the rights of other creditors because Plaintiff has not produced the intercreditor agreement referenced in its Complaint. (Tr. at pp. 8–11).

To support their first argument, Defendants contend that a pending Asset Purchase Agreement ("APA") for the 2020 models of Hyundai and Kia cars would put HCA in a more favorable position than obtaining a writ of replevin because the APA will allow HCA to recover the full amount due on those vehicles. If Plaintiff seized the cars, HCA would hypothetically recover only 70–80% of the retail price. (*Id.* at pp. 8–9). Defendants added that they have a letter of intent of $33 million dollars for the purchase of the dealership (*Id.* at 20), which is more than enough to cover their debts to both NMAC and HCA,[7] and the approximately $1.2 million dollars in unpaid state sales taxes. (*Id.* at p. 16) Although Defendants admit they are in default under the terms of the Agreements, Defendants ask the Court to consider that up until September 2019, no cars were sold out of trust, all payments were made on time to HCA, and the default resulted from a "technicality"—Nemet defaulted on an agreement with an intercreditor and voluntarily terminated its Nissan franchise. (*Id.* at p. 7).

Plaintiff contests each of Defendants' arguments. Plaintiff avers that HCA will not be better off without an order of seizure because it can return 2019 and 2020 models to the manufacturer for their original purchase price and will not need to sell them wholesale as Defendants propose. (*Id.* at pp. 22–23). However, each day these vehicles, along with the older models, decrease in value and experience wear and tear at the dealership. (*Id*. at p. 16). Any further delay in acquiring the vehicles lowers HCA's potential recovery. (*Id.*). In response to Defendants' second argument, Plaintiff points out that pursuant to the ILSA and the UCC, HCA has "a security interest in the receivables and the ability upon default to seek recourse against them." (*Id*. at p. 19). Thus, its hands are clean. Lastly, Plaintiff stated that NMAC has no interest in the Hyundai and Kia cars serving as Plaintiff's Collateral because NMAC has already seized the cars it has an interest in pursuant to a stipulation of consent. (*Id*. at p. 13). HCA fears that without an order of seizure, Nemet will go "out of trust" with the Collateral as it did with NMAC's collateral. (*Id*. at pp. 16–17). HCA believes an order of seizure is necessary to minimize any additional losses.

---

[6] HCA acknowledges that some vehicles have been sold since the filing of the Verified Complaint. (Smith Decl. at 2). Plaintiff's application seeks to recover the remaining vehicles that Nemet has not yet sold, which is approximately 138 vehicles. (*Id*.).

[7] Defendants pointed out that Nemet has sold cars and repaid some debts since September, lessening the $5 million-dollar deficit to HCA. (Tr. at p. 19).

5

Having carefully considered the Parties' arguments, in addition to the record, I find that Plaintiff has demonstrated its probable success on the merits of its replevin claims. N.Y. C.P.L.R. § 7102(d). Defendants' arguments are insufficient to defeat Plaintiff's motion. As an initial matter, the "technical" nature of a default does not change the fact that Defendants defaulted under the Agreements, and therefore Plaintiff is entitled to certain rights. (*See* Tr. at p. 7 ("If a default, it's a default, whether it's technical default or big default, a little default. A default is a default is a default.")).

Defendants' first purported defense, which argues that both Parties will be better off without an order of seizure, is simply not a defense. Aside from the fact that Plaintiff presents persuasive arguments as to why HCA would *not* be better off, Plaintiff's right to the collateral does not depend on the financial impact seizure would have on the Parties. Plaintiff's entitlement to its Collateral depends solely on whether it has a superior right over Defendants to the vehicles.

Although the "unclean hands" doctrine may be a defense in replevin actions, the doctrine is inapplicable here for two reasons. First, Plaintiff holds a valid security interest in the receivables, which it can seek recourse against in the event of Defendants' default. (Dkt. No. 1 at 50; ILSA § 8). Second, the core of Defendants' argument is flawed. The underlying rationale of the "unclean hands" doctrine is that "equity will not aid a person to reap the benefits of his own misconduct." *Puebla Palomo v. DeMaio*, No. 5:15-CV-1536 (LEK) (TWD), 2019 WL 4195300, at *10 (N.D.N.Y. Sept. 4, 2019) (quoting Restatement (Second) of Torts § 940; internal quotation marks omitted). In furtherance of its underlying purpose, the doctrine prohibits equitable relief "when, but only when, an individual's misconduct has 'immediate and necessary relation to the equity that he seeks.'" *Henderson v. U.S.*, 135 S.Ct. 1780, 1783 n.1 (2015) (quoting *Keystone Driller Co. v. Gen. Excavator Co.*, 54 S.Ct. 146, 147 (1933)). If the "right for which the plaintiff seeks protection . . . did not accrue to him because of the misdeed," the plaintiff's conduct is secondary and the doctrine of unclean hands does not apply. *Puebla Paloma*, 2019 WL 4195300, at *10 (quoting Restatement (Second) of Torts § 940). "[T]he fact that [the] plaintiff himself may have sinned in some other connection does not make him an outlaw, deprived of all legal rights." *Id.* (quoting *Jacoby-Bender, Inc. v. Jacques Kreisler Mfg. Corp.*, 287 F. Supp. 134, 135 (S.D.N.Y. 1968); internal quotation marks omitted). Here, Defendants claim of any malfeasance related to the receivables has no "immediate and necessary relation" to the cars it seeks to recover. *Henderson*, 135 S.Ct. at 1783 n.1.

Defendants' last argument is not persuasive either. Defendants argue that Plaintiff has not established a superior claim to the assets because there is an intercreditor agreement between Plaintiff and Nissan which Plaintiff has not produced. This agreement could hypotehtically prove whether Nissan or HCA has a superior right to the collateral vehicles. (Tr. at pp. 11–12). However, under New York law, "[i]t is no defense to a replevin action that someone other than the plaintiff is the true owner of the property: 'the plaintiff need only establish a superior possessory right in the chattel to that of the defendant.'" *Pivar v. Graduate School of Figurative Art of the New York Academy of Art*, 290 A.D.2d 212, 213 (N.Y. App. Div. 1st Dep't 2002) (citations omitted). Since Nissan has not come forth with a superior right in this action, and HCA has demonstrated a superior right in the collateral to Defendants under the Agreements, I find that HCA has the superior possessory right to the collateral vehicles.

### III. CONCLUSION

For the foregoing reasons, I respectfully recommend that Plaintiff's request for an order of seizure for the vehicles serving as collateral be GRANTED. Plaintiff's counsel is hereby directed to serve copies of this Report and Recommendation upon Defendants by regular and certified mail and to file proof of service on CM/ECF. Any objections to the recommendations made in this Report must be filed with the Clerk of the Court and the Honorable Carol Bagley Amon within fourteen (14) days of receipt hereof. Failure to file timely objections waives the right to appeal the District Court's Order. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Small v. Sec'y of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).

**SO ORDERED.**

*Ramon E. Reyes Jr.*
Ramon E. Reyes, Jr.
U.S. Magistrate Judge

Dated: October 29, 2019
Brooklyn, NY
